BLANK ROME, LLP
ATTORNEYS FOR DEFENDANT
TIANJIN INTERNATIONAL SHIPPING
AGENCY CO. LTD.
JACK A. GREENBAUM (JG 0039)
405 LEXINGTON AVE.
NEW YORK, N. Y. 10174]
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PADRE SHIPPING, INC.,

       Plaintiff,                    07 CV 9682 (JFK)

– v –

YONG HE SHIPPING, *et al*,

       Defendants.

---

### SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION BY DEFENDANT PORTRANS INTERNATIONAL SHIPPING AGENCY CO. LTD. TO VACATE MARITIME ATTACHMENT AND DISMISS COMPLAINT FOR FAILURE TO STATE A CLAIM

Pursuant to the Court's instructions at the hearing on January 2, 2008, this Supplemental Memorandum is submitted on behalf of defendant Tianjin Portrans International Shipping Agency Co. Ltd. ("Portrans"), in support of its motion pursuant to Supplemental Rule E(4)(f) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Claims, and Rule 12(b)(6) of the Federal Rules of Civil Procedure, in response to Plaintiff's amended Complaint. Portrans moves to (1) vacate the Order for issuance of Process of Maritime Attachment and Garnishment against Portrans' own assets because no prima facie claim has been stated against Portrans; (2) dismiss the Third Amended Complaint against Portrans for failure to state a claim;

and (3) in any event, release from restraint specific sums of money that do not belong to Portrans. After Portrans' original motion was filed, an additional $22,000 of funds belonging to another client of Portrans' was restrained, and is now included in the third branch of the motion.

As a result of Portrans' motion to dismiss the alter ego claim against it for failure to state a claim, Plaintiff withdrew that complaint altogether and filed a completely different claim in a Third Amended Complaint (¶¶ 21, 22, 118-147). (For ease of reference, the Third Amended Complaint will be referred to hereafter as "the Complaint.") Therefore, the legal reasons underlying the first and second branches of Portrans' motion must necessarily change, but the motion remains equally valid.

In summary, the grounds for Portrans' motion applicable to the new claim are:

1. The new claim against Portrans is that Plaintiff was damaged by its inability to exercise a lien on cargo because Portrans signed "freight prepaid" bills of lading and the bills did not incorporate Plaintiff's charter party with its lien clause. Plaintiff relies upon the Master's letter to Portrans authorizing it to sign the bills of lading. (Complaint Ex. C.) In fact:

(i) the Master's letter of authority provided that the <u>charterer</u>, Yong He, not Plaintiff, should authorize Portrans to sign "freight prepaid" bills of lading. The Complaint shows that Yong He did instruct Portrans to sign "freight prepaid" bills of lading, through Yong He's agent, Old Eastern Mediterranean Co. S.A. ("Old Eastern").

(ii) As a matter of English law, the Charterer, Yong He, was entitled to the issuance of "freight prepaid" bills of lading, and Plaintiff had no right to have its charter party incorporated in the bills. In any event, the allegation that the charter party was not incorporated in the bills of lading is immaterial. It had no effect on Plaintiff's ability to exercise a lien on cargo because the properly issued "freight prepaid" bills of lading precluded the exercise of any lien.

2

2. The sum of $558,499.33 that has been restrained is not Portrans' property, but the property of Portrans' client, Golden Pacific Sea (HK) Group Limited ("Golden Pacific") and was entrusted to Portrans for onward transmission to its client.

3. The sum of $22,000 that has been restrained was an <u>advance</u> from Kent Shipping Co. Ltd. ("Kent"), entrusted to Portrans for payment to suppliers of goods and services to Kent's vessel, the AMARYLLIS. It was not reimbursement to Portrans of sums Portrans had paid the suppliers. Therefore, the funds belonged to Portrans' customer, not to Portrans.

## ARGUMENT

### POINT I

### THE COMPLAINT FAILS TO STATE A PRIMA FACIE CLAIM AGAINST PORTRANS

As pointed out in Portrans' first Memorandum of Law, Plaintiff has the burden of demonstrating it has stated a prima facie claim against Portrans. <u>Aqua Stoli Ltd. v. Gardner Smith Pty. Ltd.</u>, 460 F. 2d 434 (2d Cir. 2006). The Complaint does not state a prima facie claim.

The purported claim is that Portrans signed bills of lading which were marked "freight prepaid" and failed to incorporate Plaintiff's charter party with defendant Yong He, with its lien clause, allegedly in violation of the Master's letter of authority. (Complaint Ex. C). According to the Complaint, this deprived Plaintiff of the ability to exercise a lien on cargo at the discharge ports to secure its claims for unpaid hire, port expenses, and damages for Yong He's use of the ship for longer than the stipulated charter period. (Complaint ¶¶ 124, 127, 130, 131, 139, 144 and 147)[1]

---

[1] The Complaint also alleges that some bills of lading were pre-dated, failed to note pre-shipment damages to the cargo, and were not claused "weight [etc.] unknown." However, no claims of cargo damage or any other claims are asserted with respect to those allegations (<u>see</u> ¶ 147 to the Complaint), so there is no need for us to burden the Court with extraneous arguments.

However, the facts stated in the Complaint and the exhibits incorporated therein clearly show that Portrans <u>did</u> comply with the Master's letter regarding the signing of "freight prepaid" bills of lading.[2] The "freight prepaid" endorsement itself precluded the exercise of any lien, *infra* at 8, 9, so the allegation about not incorporating the charter party is immaterial. Therefore, the Complaint fails to state a claim.

Further, Plaintiff's charter party with Yong He is subject to English law. (<u>See</u> ¶¶ 28 and 32 of the Complaint, and Ex. A thereto at clauses 45 and 101.) As a matter of English law, Plaintiff could not forbid the issuance of "freight prepaid" bills of lading or require incorporation of its charter party into the bill of lading.

**A. The Complaint shows that Portrans complied with the Master's letter of authority regarding the signing of "freight prepaid" bills of lading.**

The Master's authorization letter (Complaint Ex. C) provided:

> I, hereby authorize you, as charterers' agents to sign bills of lading for cargo loaded on my vessel at this Port of XINGANG CHINA,
>
> \*             \*             \*
>
> 8. Bills of lading marked "freight prepaid" not to be released <u>unless</u> you receive instructions from vessel's disponent Owners (Time Charterers) Messrs. Yong he shipping (hk) ltd.[3]

The Complaint shows that Yong He <u>did</u> authorize the release of the "freight prepaid" bills of lading through its agent, Old Eastern.

The fact that Old Eastern instructed Portrans to sign the "freight prepaid" bills of lading is acknowledged in ¶¶ 94 and 95 of the Complaint and in the Second Declaration of Portrans' Managing Director, Mr. Xu. The fact that Old Eastern acted as Yong He's agent in doing so is

---

[2] The freight referred to in "freight prepaid" is the money paid by the cargo owners to the time-charterer for the carriage of the cargo.

[3] Underscoring throughout this memorandum is added by us, unless otherwise indicated.

shown in ¶¶ 119 and 121 of the Complaint.[4] Thus, on the face of the Complaint, Portrans complied with the Master's letter of authority with respect to the execution of "freight prepaid" bills of lading by acting on Yong He's instructions, received from Yong He's agent, Old Eastern.

As the Complaint shows that Portrans complied with the Master's letter of authority, no claim exists against Portrans for signing "freight prepaid" bills of lading. As the bills of lading were marked "freight prepaid," Plaintiff could not exercise a lien and it is therefore immaterial that the lien clause in the time-charter was not incorporated in the bills of lading.

**B. Under English law, Plaintiff was required to authorize issuance of "freight prepaid" bills of lading and was not entitled to have the charter incorporated in the bills.**

Clause 8 of Plaintiff's Charter Party (Ex. A to the Complaint) provides:

> * * * The Master shall be conversant with the English language and (although Appointed by the Owners) shall be <u>under the orders and directions of the Charterers as regards employment and agency</u>; but always according to Charter Party terms * * *

Clause 30 provides:

> (a) The Master shall sign the bills of lading for cargo <u>as presented</u> in conformity with mates or tally clerks' receipts. However, the Charterers may sign bills of lading or waybills on behalf of the Master with the Master's prior written authority, always in conformity with mates receipts. Master will authorize in writing Charterers or their agents to sign on his behalf Bill(s) of Lading in strict conformity with Mate's receipt.[5]

---

[4] Paragraph 22 asserts that Portrans was Yong He's port agent. Paragraphs 119 and 121 state that Portrans "was appointed by the Charterer's interests" and "was instructed by the charterer's agents." Paragraph 25 shows that the charterer in question was Yong He. Paragraphs 94 and 95 identify Old Eastern as the agent who made the appointment and gave the instructions on behalf of the vessel's charterer, Yong He.

The Complaint's assertion that Old Eastern was Yong He's agent is consistent with the fact that some of Old Eastern's emails to Portrans bore the reference "tct [time charter trip] dely [delivery] China redely med[iterranean] a/c [account] yong he shipping." (Ex. 5 to Mr. Xu's first Declaration in support of Portrans' motion.)

[5] The mate's receipts contain the description of the cargo.

> (b) All bills of lading shall be without prejudice to this Charter Party and the Charterers shall indemnify the Owners against all consequences or liabilities which may arise from any inconsistency between this Charter Party and any bills of lading signed by the Charterers or by the Master at their request.

Clause 23 provides:

> The Owners shall have a lien upon all cargoes and all sub-freights and/or sub-hire irrespective of B/Ls for any amounts due under this Charter Party * * *

In the PADRE charter, the phrase "irrespective of B/Ls" was added, as can be confirmed by comparing the printed form published in M. Wilford, T. Coghlin, J. Kimball, Time Charters (5th Ed. 2003) at p. 13. Time Charters is a highly regarded and often cited text book on the subject for which it is named. It is comprised of an English law chapter followed by an American law chapter for each sub-topic of time charter parties.

As discussed in Time Charters, *infra*, English law requires a ship owner to authorize "freight prepaid" bills of lading if so requested, and does not permit the ship owner to insist that the bills incorporate the time charter. England's highest Court, the House of Lords, unanimously and unequivocally so held in Federal Commerce and Navigation Ltd. v. Molena Alpha Inc. (The "NANFRI," "BENFRI," and "LORFRI."), [1979] Vol. 1 Ll. L. R. 201 (1978) (hereafter "the NANFRI"). For the Court's convenience, a copy of the NANFRI decision is appended hereto.

The NANFRI involved a Baltime form of time charter party, which contains essentially the same relevant clauses as the New York Produce Exchange time charter at issue in the instant case, which is Ex. A to the Complaint. NANFRI clause 9, quoted at p. 209 of the decision, provided

> . . . the Master to be under the orders of the charterers as regards employment, agency, or other arrangements. [*c.f.* PADRE clause 8, *supra.*] The charterers to indemnify the owners against all consequences or liabilities arising from the master, officers or

6

900200.00001/6603409v.1

> agents signing bills of lading or other documents or otherwise
> complying with such orders . . . [*c.f.* PADRE clause 30(b), *supra*.]

PADRE clause 30 goes even further with respect to the Master's obligation to follow the charterers' orders. PADRE clause 30 expressly requires the Master to sign (or to authorize agents to sign) bills of lading "<u>as presented</u>." The Fifth Circuit cited English law in writing: "[T]he provision in the charter party that the master shall sign bills of lading is not a mere authority for him to do so, but an agreement that he shall do so, for a breach of which the owner is liable." Field Line (Cardiff) Ltd. v. South Atlantic S.S. Line, 201 F. 301, 304 (5th Cir. 1912).

NANFRI clause 18, quoted at p. 201 of the decision, provided:

> The Owners to have a lien upon all cargoes and sub-freights
> belonging to the Time Charterers and any Bill of Lading freight for
> all claims under this charter . . . [*c.f.* PADRE clause 23, *supra*.]

The charterers of the NANFRI, LORFRI, and BENFRI made deductions from their charter hire payments for claims with which the ship owners did not agree. The ship owners therefore refused to issue "freight prepaid" bills of lading and insisted that the bills of lading incorporate all the terms and conditions of the respective time charter parties. The House of Lords held that the ship owners' refusal to issue "freight prepaid" bills and insistence on incorporating the charter terms was a material breach that justified the charterers in terminating the charter parties. In fact, the House of Lords declined to address the issue of whether or not the charter party permitted the charterer to take the deductions it did, because the ship owners' position with respect to the bills of lading was a repudiatory breach in any event.

Lord Wilberforce wrote, at p. 206:

> It is important in this connection to have in mind that the present
> charters are time charters, the nature and purpose of which is to
> enable the charterers to use the vessels during the period of the
> charters for trading in whatever manner they think fit. The issue of
> bills of lading in a particular form may be vital for the charterers'

7

trade, and indeed in relation to this trade, which involves c.i.f. or c. & f. contracts, the issue of freight pre-paid bills of lading is essential if the trade is to be maintained. Furthermore, cl. 9, as is usual in time charters, contains an indemnity clause against all consequences or liabilities arising from the master signing bills of lading. <u>This underlines the power of the charterers, in the course of exploiting the vessel, to decide what bills of lading are appropriate for their trade and to instruct the masters to issue such bills, the owners being protected by the indemnity clause.</u>

Then what limitations are there upon this power? <u>It must be clear that the owners cannot require bills of lading to be claused so as to incorporate the terms of the time charter;</u> such a requirement would be contrary to the whole commercial purpose of the charterers. But the appellants contend that at any rate the charterers have no right to require the master to issue bills of lading which would defeat the owners' right of lien . . . .

<u>A freight pre-paid bill of lading might prejudice this lien, since, if the freight had been paid before the lien was sought to be exercised, there would be nothing on which it could operate.</u>

In my opinion, this argument attributes too much force to the lien clause. This clause, just as much as cl. 9, must be read in the context of the whole contract, and must be related to the commercial situation which exists under time charters. The lien clause must be read as giving the owners a lien upon such freights or sub-freights as, in the event, come to be payable, and which in fact are payable, under any sub-charter or bill of lading, <u>but it cannot be read as interfering with the time charterers' primary right to use the ship and to direct the master as to its use.</u> * * *

. . . I think it must follow . . . that to require the master to sign freight pre-paid bills of lading <u>is not to require him to act inconsistently with the charter, that to do so is within the powers of the time charterers and that for the owners to prevent their masters from acting on any such requirement is a breach of the time charter</u>, specifically, a breach of clause 9.

Continuing at p. 207, Lord Wilberforce wrote:

My Lords, I do not think that there can be any doubt that the owners' breach or threatened breach in the present case, consisting in their announcement that their masters would refuse to issue bills of lading freight pre-paid and not "claused" so as to refer to the

charters, prima facie went to the root of the contract as depriving the charterers of substantially the whole benefit of the contract.

Time Charters makes it clear the NANFRI decision remains good law.[6] As written at pages 359-60:

> 21.20 The master will probably be entitled to refuse to sign bills of lading presented to him for signature which do not incorporate terms which the time charter expressly provides are to be incorporated in bills of lading issued under it . . . .
>
> 21.21 But the master may not refuse to sign bills of lading because they do not incorporate other terms of the time charter, such as the lien clause, or the terms of the time charter generally. [Citing and discussing the NANFRI.]

There is no express clause in the PADRE charter party providing that the lien clause or the charter terms as a whole are to be incorporated in the bills of lading.

As written at page 363 of Time Charters:

> 21.35 The master may not usually, in order to render effective the owners' rights of lien on freights or sub-freights for amounts due under the charter, refuse to sign "freight prepaid" bills of lading, nor require a lien clause in the charter to be incorporated in the bills. [Citing and discussing the NANFRI.]

The same point is repeated at page 539:

> 30.35 Despite the fact that a freight pre-paid bill may prejudice the owners' right under Clause 17 of the 2001 revision of the Baltime charter to lien "all cargoes and sub-freights belonging to the Time-Charterers and any Bill of Lading freight", the master cannot refuse to sign such bills if they are required by the charterers. [Citing and discussing the NANFRI]

Clause 30(b) of the PADRE charter provides the bills of lading shall be without prejudice to the Charter. That does not mean, however, that the charter or its lien clause must be incorporated in the bills or that the charterer may not issue "freight prepaid" bills. As stated at page 364 of Time Charters:

---

[6] All citations to Time Charters are to the chapters on English law.

9

> 21.37 Some time charters stipulate that bills of lading are to be signed "without prejudice to the charter-party". These words do not affect the obligation of the master to sign bills of lading presented to him by the charterers; they mean only that the contract between the owners and the charterers contained in the charter remains unaffected by the signature of bills of lading in (possibly) different terms. . . ." [Citations (including the NANFRI) omitted.]

See also Crossman v. Burrill, 179 U.S. 100, 109 (1900):

> . . . The provision of the charter party which requires "the bills of lading to be signed as presented, without prejudice to this charter," while it obliges the master to sign bills of lading upon request of the charterers, does not mean that the bills of lading, or the consignee holding them, shall be subject to the provisions of the charter, but only that the obligations of the charterers to the ship and her owners are not to be affected by the bill of lading so signed.

Notably, a "freight prepaid" endorsement does not prevent the ship owner from exercising a lien on sub-freights owed by the shippers (*i.e.* cargo exporters) if the freights in fact have not been paid. As stated in Time Charters, at page 540:

> 30.36 If bills of lading are marked "freight prepaid", but freight has not in fact been paid at the time the owners make their claim for freight from the shippers, the owners rights to intervene or to intercept the freight will not be prejudiced if otherwise they had the right to do so; see, *The Nanfri*, above, *per* Lord Russell at page 210 and *The Indian Reliance* [1997] 1 Lloyd's Rep. 52, at page 55 and paragraph 30.28 above.[7]

Therefore, Plaintiff could have exercised a lien on sub-freights payable by the Chinese shippers to Yong He, if sub-freights were owing when Yong He was in default. The Complaint, at ¶ 39, indicates that Yong He fell into default on October 12. Either Plaintiff did not notify the shippers it was exercising a lien on sub-freights at that time or subsequently, or it did notify the shippers and was informed the sub-freights had been paid without notice of the lien.

---

[7] Paragraph 30.28 of Time Charters discusses liens on sub-freights in comparison to liens on cargo.

10

900200.00001/6603409v.1

## POINT II

## THE SUMS PREVIOUSLY RESTRAINED
## ARE NOT PORTRANS' PROPERTY

As discussed in Portrans' previous brief, it is Plaintiff's burden to prove that the attached property belongs to Portrans. Aqua Stoli at 445; Dolco Investments, Ltd. v. Moonriver Development Ltd., 486 F. Supp. 261, 270 (S.D.N.Y. 2007).

Mr. Xu's first Declaration shows that the sum of $558,449.33 Portrans tried to transfer to Golden Pacific was freight money Portrans collected from a cargo exporter on behalf of Golden Pacific. It was money entrusted to Portrans for the sole purpose of passing it along to its owner, Golden Pacific. It was not money "paid to" Portrans. It was not a debt that Portrans owed or was paying to Golden Pacific. Rather, it was Golden Pacific's money at all times. If the cargo shipper had wired the freight directly to Golden Pacific, there would be no issue regarding ownership of the funds. Ownership is not changed merely because the money was transferred through an intermediary port agent.

Mr. Xu's Second Declaration shows that the sum of $22,000 that Kent wired to Portrans was an advance for disbursements for a vessel that was yet to enter the port of Tianjin Xingang. It was not a repayment to Portrans of a debt for moneys Portrans had disbursed from its own pocket to suppliers of goods and services. Portrans was going to make those disbursements directly from the $22,000 entrusted to it for that purpose. Those funds were never the property of Portrans, but of Kent.

It is respectfully submitted that the decision in AET Inc. Limited v. Procuradoria de Servicios Maritimos Cardoso & Fonesca, 464 F. Supp. 2d 241 (S.D.N.Y. 2006), cited by this Court, was wrong if it was intended to mean that the originator and/or the beneficiary has a

900200.00001/6603409v.1

property interest in an electronic fund transfer ("EFT") merely because it is an EFT, irrespective of the facts underlying the transfer.

Judge Chin remarked, at p. 245, that Winter Storm Shipping Ltd. v. TPI, 301 F. 3d 263 (2d Cir. 2002) held that fund transfers "intended as payment to a third party . . . were still property of the defendant. . ." In Winter Storm, there was no dispute about the fact that the defendant, who was the originator of the EFT, was the owner of the funds at the point of origination, and the "third party" was the beneficiary of the transfer to whom the defendant owed a debt. The money did not belong to the "third party" at the point of origination of the transfer. The Court held the originator retained a property interest in the funds as they passed from the originating bank and came momentarily to rest at an intermediary bank. That was because the originator/defendant owned the funds to begin with, unlike Portrans.

The significance of Winter Storm was its holding that maritime law's broad definition of "property" under Rule B supersedes the Uniform Commercial Code's concept of "property" applicable to EFTs.[8] As the Second Circuit said in Aqua Stoli, at p. 445, n. 6, "Under state law . . . EFTs are property of neither the sender nor the beneficiary while present in an intermediary bank." Winter Storm held the originator of an EFT retained a property interest while the funds were in the custody of an intermediary bank, under the broader maritime law definition, notwithstanding the UCC.[9]

---

[8] The other point of significance in Winter Storm was its holding that Rule B superseded a provision in the UCC that would bar a Court from restraining an EFT in the hands of an intermediary bank, irrespective of ownership. UCC § 4A-503. That point is not at issue here.

[9] Even under the UCC, an originator retains what might be called a property interest. The originator has the right to cancel its payment order before the order is accepted by the intermediary bank. UCC § 4A-211. The payment order is accepted upon the intermediary bank's execution of the order. UCC § 4A-209. A payment order is executed when the intermediary bank issues a payment order to the next bank in the chain to carry out the order it received. UCC § 4A-301. An intermediary bank which was timely served with process of maritime attachment cannot execute a payment order and send the funds on to the next

900200.00001/6603409v.1

By the same token, in the cases (other than AET) in which the defendant was a beneficiary of an EFT, there was no dispute that the beneficiary would be the owner of the funds upon completion of the transfer. Therefore, those cases held a beneficiary has a property interest, in the nature of or analogous to an expectancy or a debt owed to it, while the transfer is in the custody of an intermediary bank, notwithstanding that the funds have not reached the beneficiary's account.[10]

Winter Storm did not hold that a property interest somehow sprang up (instantaneously and fleetingly) in favor of an originator during the course of an EFT if no such property interest existed at the point of origination (e.g. because the originator was merely an agent) and none would exist at the point of destination. Similarly, the "beneficiary" cases did not hold (except possibly for AET) that a property interest was suddenly created in an agent who was to receive in trust a transfer of its client's funds where no property interest would have existed if the transfer had been completed.

At bottom, there is no conflict between maritime law and state law with respect to the principle that an agent does not own or have any property interest in its principals' funds. An agent who holds property on behalf of a principal does not have title to the property. See, e.g., Cragin & Co. v. Int'l S.S. Co., 15 F. 2d 263, 264 (2d Cir. 1926) ("there [is] no mutual or successive relationship to property rights between agents and principals"). An agent that uses

---

bank. And while the originator retains a right under the UCC to cancel the transfer, the maritime attachment prevents the bank from obeying such an order.

[10] See e.g. Dominion Bulk International S.A. v. Naviera Panoceanica, SAC, 06 Civ. 6854 (LAP), 2006 U.S. Dist. LEXIS (Nov. 21, 2006); HBC Hamburg Bulk Carriers GMBH & Co. KG v. Proteinas Y Oleicos S.A. de C.V., 04 Civ. 6884 (NRB), 2005 U.S. Dist. LEXIS 8009 (S.D.N.Y. May 4, 2005); Noble Shipping, Inc. v. Euro-Maritime Chartering Limited, 2003 U. S. Dist. LEXIS 23008 03 Civ. 6039 (DLC), 2003 U.S. Dist. LEXIS 23008 (S.D.N.Y. Dec. 24, 2003). Compare Seamar Shipping Corp. v. Kremikovtzi Trade Ltd., 06 Civ. 5507 (JSR), 2006 U.S. Dist. LEXIS 83834, *7 (S.D.N.Y. Nov. 1, 2006)

900200.00001/6603409v.1

property entrusted to it by a principal in contravention of the principal's instructions is liable for conversion. Filner v. Shapiro, 633 F.2d 139, 141 (2d Cir. 1980). The principal can compel the agent to turn over the property, Harvey Brokerage Co. v. Ambassador Hotel Corp., 57 F.2d 727, 730 (S.D.N.Y. 1932).

In AET, Judge Chin also relied on the fact that the defendant/port agent's funds were commingled in the same bank account with its clients' funds.[11] He was careful to note that the defendant there failed to show it was legally obligated to maintain its bank account in the way it did. 464 F. Supp. 2d at 246. Under Chinese law, however, a business enterprise can only have one U.S. Dollar foreign exchange account. This is as true of agency companies as it is for any other kind of company. (Second Xu Decl. and Ex. 2, Art. 17; Ex. 7 Art. 10.) In China, therefore, it is not only proper for a port agent to have only one U.S. Dollar account in which to maintain both its own and its clients' funds, it cannot do otherwise.

The policy against commingling is meant to prevent creating the inaccurate appearance that the property belongs to the agent. See In re Martin Fein, 34 B.R., 333, 336-37 (Bankr. S.D.N.Y. 1983). But there is no "absolute" rule. For example, "professional agents" are entitled to mingle principals' funds with their own where doing so is justified as a matter of "business expediency." Id. (quoting Rest. (2d) Agency § 398 cmt. c.). Further, where the lowest

---

[11] Judge Chin was critical of the fact that five different clients sent their funds to one account. 464 F. Supp. 2d at 245-46. But that fact would not have been relevant if the account was an agency trust account, which invariably contains funds belonging to many clients. It is not necessary to open a separate bank account for each client's funds. That would make it nearly impossible to be an agent for numerous clients, of which many may be one-time transactions. For example, lawyers' trust accounts contain funds belonging to hundreds of clients. The purpose of the trust account is simply to make it clear the funds do not belong to the lawyer or the agent, not to distinguish one client's funds from another's. On the other hand, if the account in AET was not an agency trust account, the problem was that the account contained funds belonging to both the agent and its clients, not that it contained the funds of several clients.

In Portrans' case, however, there was no need under Chinese law and industry practice to have separate U.S. Dollar accounts for the agent and its principals, nor is that even permitted. (Xu Second Decl.)

intermediate balance of an account does not dip below the amounts deposited by the agent, the principal can still claim its funds. See In re United States Lines, Inc., 79 B.R. 542, 545 (Bankr. S.D.N.Y. 1987).

In Winter Storm, the Court relied on a forfeiture case which held an EFT is "property" that can be seized. United States v. Daccarett, 6 F.3d 37 (2d Cir. 1993). However, forfeiture does not reach property held in trust by a defendant on behalf of the true owner. United States v. Schwimmer, 968 F.2d 1570, 1583 (2d Cir. 1992).

There is no policy precluding so-called commingling by a port agent in China, because Chinese law allows the agent only one U.S. Dollar account. Therefore, commingling does not evidence ownership of the funds or defeat the principal's property in the funds. Rather, the Court must look to other evidence. Portrans has submitted irrefutable and unrefuted evidence that the funds restrained herein belong to its clients.

Portrans was not the owner of the $558,499 at the point of origination, would not be the owner at the point of destination, and never was or would be the owner of the funds. Further, Portrans was not paying a debt to the beneficiary, Golden Pacific. Rather, Portrans had collected the funds from the Chinese exporter solely in its capacity as agent of and therefore in trust for Golden Pacific. Collecting shipping charges, i.e. freights, on behalf of a foreign principal is a routine part of Portrans' functions as a port agent. This is demonstrated not only in its brochure and web site exhibited to Mr. Xu's first Declaration, but also in its foreign exchange account Registration Certificate, which is Ex. 3 to Mr. Xu's Second Declaration.

The $22,000 sent by Kent to Portrans was an advance for disbursements which would be incurred in the near future by Kent's vessel, the AMARYLLIS. The $22,000 was sent to Portrans solely in its capacity as agent of and in trust for Kent. (Second Xu Decl.) It might be

different if Portrans itself had already paid those disbursements and become a creditor of Kent. That might present the more common Rule B case in which the beneficiary of the fund transfer would actually own the money on completion of the transfer. But that is not what happened here, and Portrans never owned and never would own or have a property interest in the $22,000.

The claim in this suit is six million dollars. Port agents, like most law firms, are service organizations with little or no capital assets. While they may handle millions of dollars of other people's money, they do not have millions of dollars of their own. It would be unrealistic, unjust, and legally unfounded to permit a plaintiff to attach and ultimately recover against trust funds that a port agent was wiring to or receiving from its client (but not as a payment of any debts between the agent and the clients) on the theory that the port agent will be obliged to make good to the client. The result would be that the port agent would be made insolvent (assuming the attachment created a liability on the port agent to the client) and the innocent client would end up paying a claim to a stranger for a transaction it had nothing to do with.

## CONCLUSION

**THE ATTACHMENT SHOULD BE VACATED
AND THE COMPLAINT SHOULD BE DISMISSED
AS AGAINST DEFENDANT PORTRANS**

Dated: January 10, 2007
      New York, N. Y.

                              Respectfully submitted,
                              BLANK ROME, LLP
                              Attorneys for Defendant
                              Tianjin Portrans International
                              Shipping Agency Co. Ltd.
                              By _____
                                 Jack A. Greenbaum (JG 0039)
                              405 Lexington Ave.
                              New York, N. Y. 10174
                              (212) 885-5000

900200.00001/6603409v.1