BLANK ROME, LLP
Attorneys for Defendant
TIANJIN PORTRANS INT'L
SHIPPING AGENCY CO., LTD.
Jack A. Greenbaum (JG 0039)
405 Lexington Ave.
New York, N. Y. 10174
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PADRE SHIPPING, INC.,

    Plaintiff,                          07 CV 9682 (JFK)

    - v –

YONG HE SHIPPING, *et al*,

    Defendants.

---

    JACK A. GREENBAUM deposes and says:

    1.    I am a member of the firm of Blank Rome, LLP, attorneys for Plaintiff.
Attached hereto is the Appendix referred to in the Supplemental Memorandum in Support
of Motion by Defendant Portrans International Shipping Agency Co. Ltd. to Vacate
Maritime Attachment and Dismiss Complaint for Failure to State a Claim, dated January
10, 2008.

128947.06501/6605118v.1

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed at New York, N. Y. this 10th day of January 2008.

Jack A. Greenbaum (JG-0039)

2

Page 201

# LLOYD'S
# LAW REPORTS

Editor: Miss M. M. D'SOUZA, LL.B., Barrister

Consulting Editor: G. M. HALL, Barrister

[1979] VOL. 1]                    The "Nanfri"                    PART 3

### HOUSE OF LORDS

Oct. 3, 4, 5, 9, 10 and 11, 1978

---

FEDERAL COMMERCE AND
NAVIGATION LTD.
v.
MOLENA ALPHA INC.

SAME
v.
MOLENA BETA INC.

SAME
v.
MOLENA GAMMA INC.

(THE "NANFRI" "BENFRI" AND
"LORFRI")

Before Lord WILBERFORCE,
Viscount DILHORNE,
Lord FRASER OF TULLYBELTON,
Lord RUSSELL OF KILLOWEN
and Lord SCARMAN

Charter-party (Time) — Repudiation — Charterers deducted claim from instalment of hire — Owners instructed masters not to sign "freight pre-paid" bills of lading — Charterers treated owners' conduct as repudiating charters — Whether charterers entitled to make deductions — Whether charterers had validly terminated charters — Baltime form.

By three charter-parties, all dated Nov. 1, 1974, the owners let their vessels, *Nanfri, Benfri* and *Lorfri* to the charterers for a period of about six years. The trading limits were world wide within Institute Warranty limits subject to certain exclusions. The vessels were used by the charterers throughout for trading to and from the Great Lakes during the Great Lakes season, for the carriage of cargoes of steel and grain.

The charters which were in the Baltime form provided inter alia:

6. The Charterers to pay as hire: $5.00 . . . per DWT per calendar month . . . Payment of hire to be made in cash in Montreal . . . without discount, in advance to owners' account . . .

In default of payment the owners to have the right of withdrawing the Vessel from the service of the charterers . . .

9. . . . The Master to be under the orders of the Charterers as regards employment, agency or other arrangement . . .

11A. . . . no hire to be paid in respect of any time lost thereby during the period in which the Vessel is unable to perform the service immediately required. Any hire paid in advance to be adjusted accordingly.

11C. If upon the voyage the speed is reduced by defect in . . . machinery . . . the time so lost and the cost of any extra fuel consumed in consequence thereof . . . to be deducted from hire.

14. The Charterers . . . to advance to the Master if required necessary funds for ordinary disbursements for the Vessel's account at any port and such advances to be deducted from hire when supported by vouchers signed by the Master.

18. The Owners to have a lien upon all cargoes and sub-freights belonging to the Time-Charterers and any Bill of Lading freight for all claims under this charter . . .

Clause 12 of Addendum No. 2 provided inter alia:

In the event that any payment of hire is not paid . . . when due under Clause 6, Owners . . . must notify Charterers in writing by telex or personal delivery that the hire payment was not received when due.

In July and September, 1977, the charterers made a number of deductions from hire. The owners protested, the total amount in dispute being $46,000. From Sept. 1, the parties were in open dispute and on Sept. 6, the owners telexed the charterers asserting that they were not entitled to make any deductions unless (a) the deductions were supported by vouchers signed by the master (cl. 14); (b) the deductions were accepted by the owners; or (c) any dispute about the deduction had been

# LLOYD'S LAW REPORTS

resolved by a proper tribunal in the charterers' favour.

On Sept. 19, the charterers gave notice that they intended to deduct $47,122.43 from the hire payable on Oct. 1 under the *Nanfri* charter in respect of an alleged loss of speed during a voyage from Antwerp to Durban in the latter part of 1975, nearly two years earlier. The owners protested and on Sept. 21, gave notice of arbitration to the charterers with regard to (a) the disputed deduction of about $46,000 already made which the owners believed to be invalid; and (b) the deduction issues i.e. whether the charterers were entitled to make any deductions from hire and if so when and what deductions were permissible.

The charterers however deducted $47,122.43 from the *Nanfri* hire paid on Oct. 1. The owners protested and on Oct. 4, instructed the masters of all three vessels (i) to withdraw all authority to issue or sign bills of lading on their behalf; (ii) to refuse to sign bills of lading marked "freight pre-paid" and (iii) to insist that all bills of lading were endorsed with the following:

All terms conditions and exceptions of the time charter dated November 1st. 1974 . . . including the lien under clause 18 on bill of lading freight as well as sub-freight belonging to the time charterers are herein incorporated.

On Oct. 4, the owners' managers sent the following telex to the charterers:

The Masters of the "Benfri" "Nanfri" and "Lorfri" are being instructed to withdraw all direct or implied authority to Charterers . . . to sign bills of lading . . . Note that the Master will not sign any bill of lading (1) Endorsed "freight pre-paid" or (2) which does not bear [the endorsement incorporating the terms of the charter.]

The charterers had sub-chartered each of the vessels to Continental Grain and the consequences of the orders issued by the owners were extremely serious in that inter alia, nearly all shippers of grain and steel would not agree to accept bills which were either non-freight pre-paid or claused with a reference to the time charter and the vessels would be largely debarred and the charterers were likely to incur very substantial liabilities to Continental Grain if the cargoes which were being loaded or about to be loaded on Oct. 5, were not completed and if freight pre-paid unclaused bills of lading were not issued promptly.

There was an exchange of telex messages between the parties, the charterers insisting that the owners withdraw their instructions to the masters and the owners refusing unless the charterers paid all the deductions they had made. At 16 18 the charterers sent a final telex to the owners which stated inter alia:

. . . Owners by their conduct have clearly evinced an intention not to be bound by the terms of the charter . . . and we accept the totality of their conduct as a repudiation of the charter and we accept such repudiation . . . Accordingly we consider the charter terminated effective immediately . . .

The dispute was referred to arbitration and the umpire found in favour of the charterers but stated his award in the form of a special case, the questions of law for decision of the Court being: (1) Whether the charterers had validly terminated the charter-party on Oct. 5, 1977; and (2) the charterers were entitled to deduct from hire without the consent of the owners, valid claims which (a) arose under cl. 11 or (b) constituted an equitable set-off.

———*Held*, by Q.B. (Com. Ct.) (KERR, J.), that (1) the managers' telex of Oct. 4 setting out the instructions to the masters was a breach of each of the charters in that the owners would have been in breach if freight pre-paid bills had been presented for signature and any of the masters had then acted in accordance with these instructions; and the phraseology of the endorsement incorporating the terms and conditions of the charter-party went further than was necessary to protect the owners' interest concerning unpaid hire;

(2) the owners did not repudiate the charters merely by giving these instructions to the masters and sending the telex of Oct. 4; their actions were consistent with a belief that they were entitled to react in this way by way of riposte to the charterers' repeated deductions of hire; and in comparison with the commercial adventure as a whole the owners' threatened action ought not to be regarded as a repudiation in that the charters had three more years to run and the owners were only creating a temporary impasse;

(3) the answer to the first question was "No" and the award would be remitted to the umpire;

(4) the answers to the second question would be answered in the affirmative.

Judgment for the owners.

On appeal by the charterers:

———*Held*, by C.A. (Lord DENNING, M.R., GOFF and CUMMING-BRUCE, L.JJ.), that (1) there was no doubt that the owners' telex of Oct. 4, 1977, was a clear breach of the charter-party; the owners were threatening, without justification, to commit a fundamental breach of their obligations and actually taking steps to implement it by the instructions which they gave the masters at the crucial time; this was a clear anticipatory breach, and it was open to the charterers to accept the repudiation, as they did, and to treat themselves as discharged from any further performance;

(2) although the language in cl. 11(A) and (C) was different the result was the same in that the natural meaning of cl. 11(A) was that hire which ought not to have been paid, because it ceased before the end of the period covered by the payment in advance, ought to be recouped by extinguishment or reduction of the next payment, and the natural meaning of cl. 11(C) was that there should be a deduction from the next payment;

(3) therefore the charterers were entitled to deduct from hire without the consent of the owners, valid claims, i.e. claims which were made to deduct sums quantified by a reasonable assessment made in good faith which arose under cl. 11 of the charter;

(4) (CUMMING-BRUCE, L.J., dissenting): when an owner was guilty of a breach of contract which deprived the charterers of part of the consideration for which the hire had been paid in advance the charterer could deduct an equivalent amount out of the hire falling due for the next month but such a right would be limited to cases when the owner had wrongly deprived the charterer of the use of the vessel or prejudiced him in the use of it; equitable set off was not excluded as a matter of law and the charterers were entitled to deduct from hire without the consent of the owners valid claims which constituted an equitable set-off;

Appeal allowed.

On appeal by the owners, as to whether the charterers had validly terminated the charters, the issues being (i) whether the owners by asserting a right to control the form of bill of lading had acted or threatened to act in breach of the charter and (ii) if so whether their breach amounted to a repudiation of the contract entitling the charterers to terminate it:

————*Held*, by H.L. (Lord WILBERFORCE, Viscount DILHORNE, Lord FRASER OF TULLYBELTON, Lord RUSSELL OF KILLOWEN and Lord SCARMAN), that (1) no objection could be taken to the general proposition that a charter like any other contract had to be taken as a whole in that the obligations and rights created by one clause had to be read in the light of the fact that it formed part of a complex of contractual provisions (*see* p. 205, col. 2; p. 206, col. 1);

(2)   under cl. 9, the signing of bills of lading was included among the respects in which the master was to be under the orders of the charterers (*see* p. 206, col. 1; p. 209, col. 1; p. 210, col. 2); when the owners on Oct. 4, 1977, instructed the masters to refuse to sign any bill of lading endorsed freight pre-paid and which did not bear any endorsement referring to the conditions of the charter, they were in breach of their obligation under cl. 9 unless that obligation was to be read as qualified by cl. 18 (*see* p. 209, col. 1; p. 211, col. 1);

(3)   cl. 18 (the lien clause) had to be read as giving the owners a lien upon which such freights or sub-freights as in the event came to be payable under a sub-charter or bills of lading, but it could not be read as interfering with the charterers' primary right to use the vessel and to direct the master as to its use (*see* p. 206, cols. 1 and 2; p. 209, col. 1; p. 211, col. 1);

(4) (Viscount DILHORNE, disagreeing) the breach by the owners was only threatened in that although instructions had actually been given to the masters and the charterers had been informed, the issue of the instructions was merely a preparatory step and could have been cancelled at any time (*see* p. 206, col. 2; p. 209, col. 2); and the charterers knew that if they paid the deductions the instructions to the master would be withdrawn (*see* p. 209, col. 2);

(5)   since the purpose of the contract from the charterers point of view was that they should have the vessels for carrying on their trade from the Great Lakes, the owners' threat if it had been carried out, would have been ruinous to that trade (*see* p. 209, col. 1; p. 210, col. 1); and the owners'

instructions involved committing a breach that went to the root of the contract and the breach was repudiatory (*see* p. 207, col. 2; p. 208, col. 2; p. 210, col. 2; p. 212, col. 1);

(6)   the charterers were therefore entitled to determine the charters and the appeal would be dismissed (*see* p. 208, col. 1; p. 210, col. 1; p. 212, col. 1).

————

The following cases were referred to in the judgment:

Aries Tanker Corporation v. Total Transport Ltd., (H.L.) [1977] 1 Lloyd's Rep. 334; [1977] 1 W.L.R. 185;

Decro-Wall International S.A. v. Practitioners in Marketing, (C.A.) [1971] 1 W.L.R. 361;

Freeth v. Burr, (1874) L.R. 9 C.P. 208;

Hongkong Fir Shipping Co. Ltd. v. Kawasaki Kisen Kaisha Ltd., (C.A.) [1961] 2 Lloyd's Rep. 478; [1962] 2 Q.B. 26;

Shaffer (James) Ltd. v. Findlay Durham & Brodie, [1953] 1 W.L.R. 106;

*Shillito,* The, (1897) 3 Com. Cas. 44;

Smyth (Ross T.) & Co. Ltd. v. T. D. Bailey Son & Co., (H.L.) (1940) 67 Ll.L. Rep. 147;

Sweet & Maxwell Ltd. v. Universal News Services Ltd., (C.A.) [1964] 2 Q.B. 699;

Turner v. Haji Goolam Mahomed Azam, (P.C.) [1904] A.C. 826.

————

These were appeals by the owners, Molena Alpha Inc., Molena Beta Inc. and Molena Gamma Inc. against the decisions of the Court of Appeal (Lord Denning, M.R., Goff and Cumming-Bruce, L.JJ.) ([1978] 2 Lloyd's Rep. 132 allowing the appeals of the charterers, Federal Commerce and Navigation Co. Ltd., from the decision of Mr. Justice Kerr ([1978] 1 Lloyd's Rep. 581) given in favour of the owners and holding in effect that the instructions given by the owners on Oct. 4, 1977, to the masters not to sign freight pre-paid bills or issue bills of lading which were not "claused" so as to incorporate the terms of the charter was not conduct which repudiated the charter and which entitled the charterers to validly determine them on Oct. 5, 1977.

Mr. Robert Alexander, Q.C., Mr. Nicholas Phillips, Q.C., and Mr. Adrian Ginsberg (instructed by Messrs. Richards Butler & Co.) for the appellant owners; Mr. A. G. S. Pollock and Mr. Peter Gross (instructed by Messrs. Ince & Co.) for the respondent charterers.

The further facts are stated in the judgment of Lord Wilberforce.

Judgment was reserved.

Thursday, Nov. 22, 1978

———

### JUDGMENT

**Lord WILBERFORCE:** My Lords, this litigation arises from three charter-parties in identical form dated Nov. 1, 1974, and amended by addenda dated June 12, 1975, by which the appellants chartered three vessels called the *Nanfri,* the *Benfri* and the *Lorfri* to the respondents for six years. Because of the world recession in shipping the charters were, at the time when the relevant events occurred, advantageous to the owners and disadvantageous to the charterers. It is therefore in the charterers' interest to contend that the charters are at an end. Their contention is that the owners have committed a repudiatory breach of contract so that they were entitled, as they did in October, 1977, to determine the charters. Separate litigation has arisen regarding each of the three ships, but this has been consolidated, and I shall deal with the dispute as a single identical issue which equally affects each contract.

The relevant facts are fully given in the award in the form of a special case made by the umpire (the matter having gone to arbitration) and these, with the relevant clauses in the charter-parties, appear in the judgments of Mr. Justice Kerr, and of the Court of Appeal (*see* [1978] 1 Lloyd's Rep. 581 and [1978] 2 Lloyd's Rep. 132). No doubt they will be restated in the report of this appeal. I shall not set them out at length. The relevant points which, as it appears to me are necessary for the decision of these appeals, are the following.

1. The charters, being time charters on Baltime form 1939, provided for the payment of hire in advance on the 1st and 16th of each month. There was a clause (11) allowing deductions to be made from hire in specified events, one of which was the event of time being lost, or expense incurred, through slow steaming. It appears that in the initial years of the charters certain deductions from hire were made by charterers under cl. 11, some of which were agreed with owners in advance; others were the subject of discussion and subsequent agreement. In 1975 charterers put forward a claim in respect of slow steaming of the *Nanfri.* Owners did not agree with this claim and suggested that it be taken to arbitration, but this suggestion was not taken up by charterers, and the claim remained dormant until September, 1977. In July and September, 1977, charterers made deductions in respect of each of the three vessels which owners did not agree: they contended that charterers had over-deducted some $46,000. On Sept. 19, 1977, charterers resurrected the 1975 slow steaming claim and said that in respect of it they intended to deduct some $47,000 from the *Nanfri* hire due on Oct. 1. Owners rejected this claim. On Sept. 21 they gave notice of arbitration in respect of the validity of the deductions of $46,000 and also on the question of principle whether the charterers had any right unilaterally to deduct sums not agreed as valid. Charterers proceeded to make the threatened deductions from the Oct. 1 hire.

2. Early in October, 1977, owners, having consulted lawyers in London and in New York, gave instructions to their masters to refuse to sign bills of lading marked "freight pre-paid" and to insist that all bills of lading should be "claused" so as to incorporate the terms of the charters. On Oct. 4 owners, by telex of their managers, informed charterers of this action. Charterers protested against these instructions and insisted that they be withdrawn. Owners replied that they would withdraw the instructions if all unilateral deductions were immediately paid. On Oct. 5 charterers telexed that they treated owners' conduct as repudiation of the charters and that they terminated the charters.

3. A "without prejudice" agreement was immediately entered into by which the three vessels remained in service, all disputed deductions were paid, the charterers agreed to make no more deductions without owners' approval, and freight pre-paid bills of lading were issued without any reference therein to the charter-parties.

4. Findings made by the umpire include the following:

(a) The owners and their managers knew at all material times that charterers wished to use the vessels for Great Lakes trade, involving outward carriage of grain and inward carriage of steel. They also knew that each of these types of shipment was usually made on c.i.f. terms in which it would be usual for freight pre-paid bills of lading to be issued clean of any reference to a time charter.

(b) The owners and their managers knew that refusal to issue freight pre-paid bills was likely to cause the charterers severe commercial embarrassment and possibly substantial liability to third parties.

(c) Owners intended that the effect of their action (as communicated in October telexes) would be that charterers would pay the disputed deductions under protest and that all issues would shortly be resolved by arbitration.

(d)   The consequences for charterers of the orders issued by owners on Oct. 4 were extremely serious since, unless charterers could ensure the issue of freight pre-paid bills of lading not claused by reference to a time charter-party, the vessels would be largely debarred from the grain and steel trade; charterers would be unable to comply with existing obligations to sub-charterers; charterers were likely to be blacklisted by Continental Grain (their sub-charterers and one of the world's largest shippers of grain) and likely to incur substantial liabilities to that company if cargoes currently being loaded or about to be loaded did not have promptly issued freight pre-paid bills of lading.

My Lords, before attacking the real question in these appeals, which is whether the owners' actions were repudiatory, it is necessary to clarify the situation as regards the right of the charterers to make deductions. There are two separate questions: the first concerns the scope of the contractual right to make deductions, under cl. 11 of the charter-parties; the second the right, apart from cl. 11, to make deductions by way of equitable set off. The nature of the latter was discussed to some extent, in relation to voyage charters, in *Aries Tanker Corporation v. Total Transport Ltd.,* [1977] 1 Lloyd's Rep. 334; [1977] 1 W.L.R. 185, and in earlier cases there referred to, but there is room for argument, at least in this House, how far what was there laid down applies to time charters.

As regards the contractual claims, the umpire made only provisional findings. These were that part of the slow steaming deduction made from the *Nanfri* hire in October was probably justified but not all; that owners believed all the July and September deductions to be invalid; and that owners knew that part of the deductions (presumably of that made in respect of the slow steaming claim) was valid. In these circumstances the issue between the parties would be whether, in order to entitle the charterers under cl. 11 to make a deduction, their claim must be (a) previously established as valid, or (b) bona fide believed to be valid and calculated on a reasonable basis, or whether (c) a deduction may be made of any sum claimed whether ultimately found to be valid or not.

Mr. Justice Kerr and the Court of Appeal were able to deal with the main issue of repudiation independently of whatever answer should be given to the questions regarding deductions. Mr. Justice Kerr held that the owners' conduct did not amount to repudiation of the contract, but, formally, also held that the charterers were entitled to deduct under cl. 11

and also by way of equitable set-off claims believed to be valid and calculated on a reasonable basis. In other words, he held the owners' conduct not to be repudiatory although they were substantially wrong on the deduction issue (*see* [1978] 1 Lloyd's Rep. 581).

The Court of Appeal unanimously held the owners' conduct to be repudiatory but they differed on the deduction questions. All three members held in favour of the charterers that all the deductions in dispute could be made under cl. 11, as held by Mr. Justice Kerr. As regards equitable set-off, Lord Denning, M.R., and Lord Justice Goff held that such a right existed in relation to time charters (so distinguishing *The Aries*). Lord Justice Cumming-Bruce to the contrary thought that it did not (*see* [1978] 2 Lloyd's Rep. 132). From this analysis it appears clear that the answer to the main issue as regards repudiation does not depend on the answers to be given on the deduction issues. Counsel at the Bar agreed that this was so, and in view of this, and there being no definite findings of fact on the deduction issues themselves, did not address arguments upon them. While therefore I recognise the interest which the commercial community may have in decision of them whether as they arise under a contractual right to deduct, or under a general doctrine of equitable set-off, I must reluctantly agree to decline this task on the present occasion.

I come then to the issue of repudiation. It is first necessary to see whether the owners' conduct on Oct. 4, 1977, was a breach of contract at all: Mr. Alexander for the owners contended that it was not. His argument was that the owners, while giving the charterers very wide powers under cl. 9 of the charter-parties—

. . . the master to be under the orders of the charterers as regards employment, agency, or other arrangements . . .

which would include in general the power to require the master to issue bills of lading, nevertheless always retained the right to insist that any action required to be taken by the master, or taken by the charterers themselves, should be in accordance with the terms and provisions of the charter-parties as a whole. This, it was said, would lead to two results: first the owners would be within their rights in insisting that bills of lading should be "claused" by a reference to the time charters, secondly that the owners would be entitled to object to (and to instruct their masters to refuse) bills of lading which derogated from their right of lien on cargoes, sub-freights and bill of lading freight, as expressly conferred by cl. 18.

There can be no exception taken to a general proposition that a charter-party, as any other

contract, must be taken as a whole; the obligations and rights created by one clause must be read in the light of the fact that it forms part of a complex of contractual provisions. Some charters in fact contain in clauses corresponding to cl. 9 such words as "without prejudice to the charter" which no doubt emphasise this point. But it may well be that a particular clause is so clearly worded, and its purpose so clear, as to resist any suggestion that it should be limited, or written down, on account of some supposed inconsistency with the general purpose of the contract or by some other clause in the contract.

It is important in this connection to have in mind that the present charters are time charters, the nature and purpose of which is to enable the charterers to use the vessels during the period of the charters for trading in whatever manner they think fit. The issue of bills of lading in a particular form may be vital for the charterers' trade, and indeed in relation to this trade, which involves c.i.f. or c. & f. contracts, the issue of freight pre-paid bills of lading is essential if the trade is to be maintained. Furthermore, cl. 9, as is usual in time charters, contains an indemnity clause against all consequences or liabilities arising from the master signing bills of lading. This underlines the power of the charterers, in the course of exploiting the vessel, to decide what bills of lading are appropriate for their trade and to instruct the masters to issue such bills, the owners being protected by the indemnity clause.

Then what limitations are there upon this power? It must be clear that the owners cannot require bills of lading to be claused so as to incorporate the terms of the time charter: such a requirement would be contrary to the whole commercial purpose of the charterers. But the appellants contend that at any rate the charterers have no right to require the master to issue bills of lading which would defeat the owners' right of lien: this under cl. 18 extends to—

. . . all cargoes and subfreights belonging to the Time-Charterers and any Bill of Lading Freight . . .

A freight pre-paid bill of lading might prejudice this lien, since, if the freight had been paid before the lien was sought to be exercised, there would be nothing on which it could operate.

In my opinion this argument attributes too much force to the lien clause. This clause, just as much as cl. 9, must be read in the context of the whole contract, and must be related to the commercial situation which exists under time charters. The lien clause must be read as giving the owners a lien upon such freights or sub-freights as, in the event, come to be payable, and which in fact are payable, under any sub-charter or bill of lading, but it cannot be read as interfering with the time charterers' primary right to use the ship and to direct the master as to its use. Such authority as there is in relation to time charters supports this view. In *The Shillito*, (1897) 3 Com. Cas. 44, an action between the master and the owners, the judgment of Mr. Justice Barnes contains this passage at p. 49:

The charterer [in fact a time charterer] has a right to present any bills he chooses, and although there is a lien clause, it is inoperative, because the bills of lading contain no reference to the charterparty and there is no freight on which a lien can be exercised . . .

The master was held not to be negligent in signing bills showing freight paid in advance, and the inference is that he was bound to do so. In *Turner v. Haji Goolam Mahomed Azam*, [1904] A.C. 826, the time charter contained the words "without prejudice to this charter". In the judgment of the Privy Council it is said at pp. 836-837:

These words introduce a difficulty. It is said that they limit the authority of the captain to sign bills of lading which do not preserve to the owners . . . their lien on all goods under condition 22. This construction is a possible construction, but it has long ago been rejected both by commercial men and by judicial decision . . .

It is true that these decisions bear upon the authority of the master to sign bills of lading rather than directly upon the powers of the time charterers, but I think it must follow from their reasoning that to require the master to sign freight pre-paid bills of lading is not to require him to act inconsistently with the charter, that to do so is within the powers of the time charterers and that for the owners to prevent their masters from acting on any such requirement is a breach of the time charter—specifically a breach of cl. 9. If the masters had in the present case, acted upon the owners' instructions, an actual breach would, in my view, have been committed: they did not in fact do so because the without prejudice agreement was immediately made. But the owners' instructions (communicated to the charterers) clearly constituted a threat of a breach, or an anticipatory breach of the contract.

Was this then such a threatened, or anticipatory breach as to entitle the charterers to put an end to the charters? It was argued for the charterers that cl. 9 of the charters amounted to a condition of the contract, so that any breach of it automatically gave the charterers the right to put an end to it. I do not

agree with this. The clause is not drafted as a
condition, and on its face it admits of being
breached in a number of ways some of which
might be far from serious and would certainly
not go to the root of the contract. I regard the
clause as one, breaches of which must be
examined on their individual demerits. Was this
breach, or threatened breach, repudiatory or
not? I shall not set out at any length the
numerous authorities on anticipatory breach:
this is one of the more perspicuous branches of
the law of contract and the modern position is
clear. The form of the critical question may
differ slightly as it is put in relation to varying
situations:

> . . . an intimation of an intention to abandon
> and altogether to refuse performance of the
> contract [—or—] evince an intention no
> longer to be bound by the contract [*Freeth v.
> Burr*, (1874) L.R. 9 C.P. 208 at p. 213 per
> Lord Coleridge].

> I do not say that it is necessary to show that
> the party alleged to have repudiated should
> have an actual intention not to fulfil the
> contract. He may intend in fact to fulfil it,
> but may be determined to do so only in a
> manner substantially inconsistent with his
> obligations and not in any other way. [*T. D.
> Bailey Son & Co. v. Ross T. Smyth & Co.
> Ltd.*, (1940) 67 Ll.L. Rep. 147 at p. 159 per
> Lord Wright.]

Such as to deprive—

> . . . the charterers of substantially the whole
> benefit which it was the intention of the
> parties . . . that the charterers should obtain
> from the further performance of their own
> contractual undertakings. [*Hongkong Fir
> Shipping Co. Ltd. v. Kawasaki Kisen Kaisha
> Ltd.*, [1961] 2 Lloyd's Rep. 478; [1962]
> 2 Q.B. 26 at pp. 495 and 72 per Lord Justice
> Diplock.]

> To constitute repudiation, the threatened
> breach must be such as to deprive the injured
> party of a substantial part of the benefit to
> which he is entitled under the contract . . .
> Will the consequences of the breach be such
> that it would be unfair to the injured party to
> hold him to the contract and leave him to his
> remedy in damages . . . [*Decro-Wall
> International S.A. v. Practitioners in
> Marketing Ltd.*, [1971] 1 W.L.R. 361 at
> p. 380 per Lord Justice Buckley].

The difference in expression between these
two last formulations does not, in my opinion,
reflect a divergence of principle, but arises from
and is related to the particular contract under
consideration: they represent, in other words,
applications to different contracts, of the
common principle that, to amount to
repudiation a breach must go to the root of the
contract.

My Lords, I do not think that there can be
any doubt that the owners' breach or threatened
breach in the present case, consisting in their
announcement that their masters would refuse
to issue bills of lading freight pre-paid and not
"claused" so as to refer to the charters, prima
facie went to the root of the contract as
depriving the charterers of substantially the
whole benefit of the contract. This is clear from
the findings of the umpire to which I have
already referred. It was in fact the owners'
intention to put irresistible pressure upon the
charterers—

> . . . to compel the charterers to pay over all
> sums deducted from hire by the Charterers
> which the Owners disputed, irrespective of
> whether such deductions should ultimately be
> determined to be valid or invalid . . .
> [—award par. 27] . . .

through the action they threatened to take. If
the charterers had not given way, the charters
would have become useless for the purpose for
which they were granted. I do not think that this
was disputed by the owners—in any event it was
not disputable. What was said was that the
action of the owners, in the circumstances in
which it was taken, should not be taken to be
repudiatory. They had, on Sept. 21, 1977,
referred the whole question of deductions to
arbitration: in a short time the whole issue
would be cleared up one way or another, after
which the charters would continue to be
operated in accordance with the arbitrators'
decision. The owners' action was of an interim
character designed to have effect only until the
position as to deductions could be clarified. The
owners' interest was strongly in the direction of
maintaining the charters: their move was simply
a tactical one designed to resolve a doubtful
situation. The sums which they were forcing the
charterers to pay were inconsiderable. The
charterers had already offered to pay them in
"escrow".

My Lords, with genuine respect for the
judgment of Mr. Justice Kerr who in substance
agreed with this argument, I find myself obliged
to reject it. Even if I were prepared to accept the
assumption that arbitration proceedings set in
motion on Sept. 21, 1977, would be rapidly
concluded through an early and speedy hearing,
without a case being stated and without appeals
in the Courts (all of which must in fact be
speculative), even so the owners' action must be
regarded as going to the root of the contract.
The issue of freight pre-paid bills of lading in
respect of each of the three vessels was an
urgent, indeed an immediate, requirement.
*Nanfri* completed loading a cargo, shipped by

Continental Grain for Europe, on Oct. 5, 1977; *Benfri*, on passage to Chicago, was to load a cargo in Duluth for Europe; *Lorfri* had loaded one parcel of grain for Continental Grain on Oct. 3 in respect of which a separate bill of lading was to be issued: thereafter she was scheduled to load the balance of her capacity from Continental Grain at other Great Lakes ports.

These were pending transactions, and—

. . . the Charterers were likely to incur very substantial liabilities to Continental Grain if the cargoes which were being loaded or which were about to be loaded on 5th October were not completed and if freight pre-paid unclaused bills of lading were not issued promptly . . . [award par. 28].

Black-listing by Continental Grain was likely to follow. Thus the resolution of the deductions issue by arbitration, however soon this might be achieved, would still have left the charterers in a position where they might have lost the whole benefit of the time charters. That a "without prejudice" agreement was in fact entered into which averted these consequences is of course irrelevant though the fact that it was made does underline the extent of the pressure on the charterers. It is also irrelevant that the steps the charterers were being compelled, under threat of a breach of contract, to take were not very serious for them. A threat to commit a breach, having radical consequences, is nonetheless serious because it is disproportionate to the intended effect. It is thirdly irrelevant that it was in the owners' real interest to continue the charters rather than to put an end to them. If a party's conduct is such as to amount to a threatened repudiatory breach, his subjective desire to maintain the contract cannot prevent the other party from drawing the consequences of his actions. The two cases relied on by the appellants, *James Shaffer Ltd. v. Findlay Durham & Brodie*, [1953] 1 W.L.R. 106 and *Sweet & Maxwell Ltd. v. Universal News Services Ltd.*, [1964] 2 Q.B. 699, do not support a contrary proposition, and would only be relevant here if the owners' action had been confined to asserting their own view — possibly erroneous — as to the effect of the contract. They went, in fact, far beyond this when they threatened a breach of the contract with serious consequences.

For these reasons I agree with the decision of the Court of Appeal that the charterers were entitled to determine the contracts. The appeals must accordingly be dismissed with costs.

**Viscount DILHORNE:** My Lords, now that I have had the advantage of reading the speech of my noble and learned friend Lord Wilberforce, I do not think any useful purpose would be served by my delivering the speech I had prepared.

It is indeed unfortunate that determination of the question whether deductions can lawfully be made by way of equitable set off from the hire payable under a time charter and the question whether, if deductions can be made either by way of equitable set off or by virtue of provisions in the charter-party, the charterers are entitled to deduct (a) only amounts which they have established their right to deduct or which they have agreed with the owners or (b) sums to which they bona fide believe they are entitled calculated on a reasonable basis or (c) any sum they claim to be due to them whether or not it is must be left to another occasion.

Save in one minor respect I entirely agree with the reasoning and the conclusions reached by my noble and learned friend.

The point on which I differ from him is that I think the giving by the owners of instructions to the masters to refuse to sign bills of lading marked "Freight Pre-paid" and to insist that all bills of lading should be "claused" was an actual and not anticipatory breach of contract as it amounted to a breach of cl. 9 of the charter-party whereby it was agreed that the masters should be under the orders of the charterers.

However it makes no difference whether the conduct of the owners amounted to an actual breach, or anticipatory breach for, as my noble and learned friend has so clearly demonstrated, their conduct was repudiatory.

I agree that the appeals should be dismissed.

**Lord FRASER OF TULLYBELTON:** My Lords, the only question now remaining in this appeal is whether the charterers (respondents) validly terminated the charter-party on Oct. 5, 1977. It raises two issues:—(1) whether the owners (appellants), by asserting a right to control the form of bill of lading, had acted or threatened to act in breach of the charter-party, a time charter on the Baltime form, and (2) if so, whether their breach amounted to repudiation of the contract, entitling the charterers to terminate it.

On the former of these issues the umpire and all the Judges who have considered it have been against the owners. As I agree with that view, I shall summarise my reasons briefly. Clause 9 of the charter-party provides in the second and third sentences as follows:—

. . . The master to be under the orders of the charterers as regards employment, agency, or other arrangements. The charterers to indemnify the owners against all consequences or liabilities arising from the

master, officers or agents signing bills of lading or other documents or otherwise complying with such orders . . .

The latter sentence shows beyond possibility of doubt that the signing of bills of lading was included among the respects in which the master was to be under the charterers' orders. Accordingly when the owners on Oct. 4, 1977, instructed the master to refuse to sign any bill of lading endorsed "freight pre-paid" and which did not bear an endorsement referring to the conditions of the charter-party, they were in breach of their obligation under cl. 9 unless that obligation is to be read as qualified by some other provision of the charter-party. The argument was that it was qualified by cl. 18. But in my opinion there is no conflict or inconsistency between cl. 9 and cl. 18 and no need to regard the former as being qualified by the latter. Clause 18 does not give to the owners any right to require that the charterers shall procure that cargoes (not belonging to the charterers) shall be carried on terms that give the owners a lien over them or that there shall be in existence sub-freights over which the owners can exercise their lien. The effect of cl. 18 was simply that, if and when there were cargoes belonging to the charterers or sub-freights due to them, the owners were to have a lien over them, whatever the exact meaning of a "lien" on sub-freights may be.

That is the effect of reading the clauses according to their ordinary meaning. It is powerfully reinforced by the consideration that, if the instructions issued by the owners to masters on Oct. 4 had been carried out, the consequences for the charterers would, as found by the umpire in par. 28 of his award, have been "extremely serious", and they would have been largely debarred from using the ships for the trade for which they had hired them under these time charters. It is therefore difficult to suppose, as a matter of commercial sense, that the contract can have entitled the owners to give such instructions; if it did, the owners could at any time have held a pistol to the charterers' head and demanded that the charter-party be amended in any way that seemed good to them.

Further, the main reason why the owners contended that they were entitled to instruct the master to refuse to sign clean bills of lading was that, if he did sign, they would lose their so-called "lien" on any sub-freights that might be due from the shippers to the charterers. I very much doubt whether that contention is well-founded. The bills of lading are a contract between the shipper and the shipowner—see *Turner v. Haji Goolam Mahomed Azam*, [1904] A.C. 826 and they would not affect the rights and obligations of the shipowners and

charterers inter se including such rights as the owners have under cl. 18. No doubt the shipper or his consignee, holding clean bills of lading, would be entitled to have the cargo unloaded free from lien, but if in fact the shipper had not paid the freight due to the charterers I do not think he could rely on the clean bill of lading in defence to 'a claim for payment. The only question for him would be to whom was the payment due.

We heard some argument as to whether, if the result of carrying out the owner's instructions would have been a breach of their contract, a breach had been actually committed or merely threatened. In the circumstances of this case it would not make any difference, but my view is that the breach was only threatened. True, the instructions were actually given to the masters and the charterers were so informed, but the issue of instructions was merely a preparatory step, useful in making the threat realistic and necessary to enable it to be carried out quickly. The instructions given by the owners to their own servants could be cancelled at any time and the umpire found that the charterers knew that if they paid the disputed deductions the instructions to the masters would be withdrawn. That is what happened; the threat to the charterers was enough and it did not have to be put into action.

The second issue is whether the threat, if it had been carried out, would have been repudiatory. It was argued that the second sentence in cl. 9 under which the master was to be under the orders of the charterer contained a "condition", the breach of which entitled the charterers at once to terminate the contract. I do not agree. It is clearly not expressed as a condition. Nor in my opinion is it converted into a condition, or strengthened in any way, by the third sentence of cl. 43 of the charter-party which was relied on by the respondents. That sentence provides—

. . . Owner hereby expressly undertakes and agrees that it will at no time use or employ the vessel in any manner inconsistent with the terms of this charter or with the owner's obligations hereunder, or with the legitimate orders for the employment of the vessel given from time to time by the charterer . . .

The owner's instructions as to the form of bills of lading to be signed by the master cannot be regarded as "employing" the vessel in a manner inconsistent with the charter and the sentence appears to me to have no bearing upon the construction of cl. 9.

It is easy to imagine minor breaches of the charterers' orders that would be of no consequence in the performance of the contract

LLOYD'S LAW REPORTS                [H.L.

as a whole. The argument for the respondents was that the second sentence in cl. 9 contained hidden within itself two obligations — first an obligation on the owners to place the master under the orders to the charterers and second an obligation on the master to obey those orders. Only the first of these was said to be a condition, on the ground that it went to the root of the contract. So failure by the master to carry out an order from the charterers in any respect, however trivial, would be a breach of a condition (and therefore repudiatory) if caused by the owner's failure to place him under the charterers' orders, but would only be a breach of contract (giving rise to a claim for perhaps minimal damages) if caused by the master's personal fault. Everything would depend on the cause of disobedience. That seems to me to be unacceptable.

Treating the second sentence of cl. 9 then as an innominate or intermediate term, I proceed to consider whether the threatened breach of it here was so fundamental as to amount to repudiation of the contract. The test of repudiation has been formulated in various ways by different Judges. I shall adopt the formulation by Lord Justice Buckley in *Decro-Wall International S.A. v. Practitioners in Marketing Ltd.,* [1971] 1 W.L.R. 361 at p. 380C as follows:

> Will the consequences of the breach be such that it would be unfair to the injured party to hold him to the contract and leave him to his remedy in damages as and when a breach or breaches may occur? If this would be so, then a repudiation has taken place.

Judged by that test I have no doubt that the breach here was repudiatory. The whole purpose of the contract from the charterers' point of view was that they should have the use of the ship for carrying on their trade from the Great Lakes, but if the owner's threat had been carried out it would have been ruinous to that trade. I need not repeat the umpire's finding as to the consequences in full but I attach particular importance to his finding in par. 28(iii)—

> . . . The charterers were likely to be blacklisted as grain carriers by Continental Grain, which is one of the world's largest shippers of grain. In consequence the charterers' reputation would be very seriously damaged and they would probably have been unable to obtain business for the vessels from other major shippers of grain . . .

Such damage to their reputation might well have been lasting and not limited to the duration of actual interruption of the trade. In face of that finding, I am, with all respect to Mr. Justice Kerr, unable to agree with his view

that the owners were only creating a "temporary impasse". It was said that the breach was not repudiatory because the owners were merely reacting against the charterers' unilateral deductions from the hire, and particularly against their revival of a stale claim for deductions. This is really a plea in mitigation but it does not affect the result. If the owners' reaction involved committing a breach that went to the root of the contract, they cannot in my opinion escape the legal consequences by pleading that they had been provoked. I would therefore hold that the breach was repudiatory. For these reasons I would dismiss the appeals.

**Lord RUSSELL OF KILLOWEN:** My Lords, as these three cases have progressed there fall for decision in each of them only two questions, the same in each case. The first question is whether the owner committed a breach of contract in instructing the master to refuse to sign bills of lading marked "Freight pre-paid" and threatening to adhere to those instructions.

It is quite clear that cl. 9 prima facie confers on the time charterer the right to require bills of lading to be so marked. The contention of the owner is that — at least when hire is allegedly in arrear by unjustified deductions — the instructions to the master were justified because that marking of bills of lading detracted from the owner's lien rights (so labelled) under cl. 18. This, and this only, was the justification advanced by the owner for its actions. But this attempted justification involves a fallacy. That marking of bills of lading could not possibly detract from the cl. 18 "lien" rights.

The fact that cl. 18 refers expressly to bill of lading freights appears to me to add nothing to the lien conferred by that clause on sub-freights belonging to the charterer, and serves only to distract the mind from the true scope of the lien. The lien operates as an equitable charge upon what is due from the shipper to the charterer, and in order to be effective requires an ability to intercept the sub-freight (by notice of claim) before it is paid by shipper to charterer. The simple question is whether the marking of bills of lading freight pre-paid interferes with that ability to intercept. It cannot. If freight is in fact pre-paid before issue of the bill of lading, cadit quaestio. If not, how does the marking freight pre-paid interfere with such ability to intercept as may be available to the other? For these reasons I say that the justification suggested by the owner for its actions is fallacious.

For the owner the only answer put forward was that it would be strange that, if the master for the owner signed a bill of lading freight pre-

paid, the owner should demand of the shipper that freight *not* paid should be paid to the owner. I see nothing impossible in this. The shipper would if necessary interplead. He could not, not having paid the freight, assert that he *had* paid: nor could he assert an estoppel against the owner: he would be simply faced with rival claims, not caring which was right, and knowing only that he owed someone the sub-freight.

For those reasons I have no doubt that the owner was in its actions guilty of a breach of contract.

I would have been prepared also to arrive at the same conclusion on a different ground: that is that in the particular circumstances of the trade for which these vessels were time chartered it was preponderantly essential, as concerned with c.i.f. or c. & f. contracts, that bills of lading should be marked freight pre-paid. In such circumstances I cannot conclude that the actions and proposed actions of the owner were a sensibly justifiable intervention with the charter's cl. 9 requirements as to the marking of bills of lading: in other words in the circumstances of the charter cl. 18 must relevantly yield to cl. 9 to make sense.

Having reached that conclusion upon the first question, the second question is whether the breach of contract by the owner was such as entitled the charterer to treat it as repudiation of the charter contract by the owner.

For the charterer it was contended that cl. 9 involved either expressly or by implication a strict *condition* that the charterer's rights thereunder would not be breached by the owner, so that any breach by the owner would entitle the charterer to assert repudiation. I do not favour that approach. In recent cases it has not found favour. It was argued that if the master disobeyed an order by the charterer it would (or could) be a mere breach of warranty: it might be a minor matter. But if the owner countermanded an order by the charterer under cl. 9 it must be breach of a condition. I am not content with this division, attractive as it was at first submission. I would be unwilling to hold that every contradiction by the owner of an order by the charterer to the master was necessarily repudiatory of the charter contract.

But the question remains whether this particular contradiction could properly be regarded as repudiatory, as it was considered by the umpire and all members of the Court of Appeal, though not by Mr. Justice Kerr.

The question is whether, objectively regarded and in all the circumstances of the case, the conduct of the owners can properly be said to strike at the root or essence of this contract. In my opinion it can. As I have said the ability to have bills of lading issued marked freight pre-paid was essential to the time charterer's exploitation of the vessels in trading therewith: and this was of course known to the owners. Counsel for the owners frankly admitted in argument that the instructions to the masters would have been fatal to the charterer's trade. Indeed on the crucial date of Oct. 5 bills of lading in respect of two of the three vessels were due to be called for that very day. The special case made the following findings in par. 28:

28. The consequences for the charterers of the orders issued by the owners on 4th October 1977 were extremely serious, in that

(i) Unless the charterers could ensure the issue of freight prepaid bills of lading which were not claused with any reference to a time charterparty the vessels were largely debarred from use by the charterers in the grain and steel trades, since nearly all of the shippers of grain and steel would not agree to accept bills of lading if they were either non-freight prepaid or claused with a reference to a time charter.

(ii) The charterers would be unable to comply with their existing obligations to sub-charterers.

(iii) The charterers were likely to be blacklisted as grain carriers by Continental Grain, which is one of the world's largest shippers of grain. In consequence the charterers reputation would be very seriously damaged and they would probably have been unable to obtain business for the vessels from other major shippers of grain.

(iv) The charterers were likely to incur very substantial liabilities to Continental Grain if the cargoes which were being loaded or which were about to be loaded on 5th October were not completed and if freight prepaid unclaused bills of lading were not issued promptly.

And in par. 26 it was found that the owners knew that the charterers were likely to suffer those consequences.

It was contended for the owners that their breach should not be regarded as striking at the root or essence of the contract because they had already set on foot arbitration proceedings designed to decide the disputed questions of deductions from hire: that such arbitration could produce a decision within a reasonably short time: that the question whether the owner's instructions to the masters were or were not breaches of contract could be raised and solved in that arbitration: and that thereafter a considerable period of the time charters would

**LLOYD'S LAW REPORTS**

[1979] VOL. 1]                    The "Hermine"                    PART 3

remain to the charterers. Accordingly, it was contended, in those circumstances it could not be said that the action of the owners (if persisted in) would deprive the charterers of more than some part of the benefit of their contract, and so should not be regarded as striking at the root or essence of the contract. I do not accept that contention. Having regard to the findings in the special case I cannot regard the conduct of the owners as something which, if persisted in, would lead merely to a temporary suspension of the charterer's benefits under the charter.

It was further contended for the owners that, insofar as they made it plain that the instructions to the masters would be withdrawn if the charterers paid at once to the owners the total of the unpaid hire the deduction of which was disputed, the breach or threatened breach, however grave, being in a sense conditional, could not be regarded as repudiation. And, it was added, since the charterers were anyway prepared to place the disputed amount "in escrow" it was reasonable to insist on that condition, inasmuch as if in arbitration it proved that the deductions were justifiable there would be plenty of scope under the charter thereafter for the charterers to recoup themselves by deduction from future hire obligations.

I am not able to accept this contention that a breach or threatened breach of the charter now in question escapes the quality of being repudiatory because it is indicated that it will not be pursued if the other party to the contract gives way in a field of dispute thereunder: and I do not think that it matters whether the indication is phrased thus, or whether it is indicated that the breach will be pursued unless the other party gives way.

A further contention for the owners was that their action or threat could not seriously and objectively be regarded as repudiation, because the hire rates under this time charter were greater than the current going rates, and termination of the charters could only harm the owners. That the owners would be so harmed is true, but that does not appear to me to detract from the essential gravity of the breach and threatened breach so as to reduce it to the level of a mere tactical exercise of "muscle", or even bluff.

I am accordingly of opinion that there was here repudiation by the owners accepted by the charterers, and would dismiss these appeals.

**Lord SCARMAN:** My Lords, I have had the advantage of reading in draft the speech delivered by my noble and learned friend Lord Wilberforce. I agree with it: and for the reasons which he gives I would dismiss the appeal with costs.

**COURT OF APPEAL**

Nov. 6, 7 and 8, 1978

UNITRAMP
v.
GARNAC GRAIN CO. INC.

(THE "HERMINE")

Before Lord Justice ROSKILL, Lord Justice GEOFFREY LANE and Sir DAVID CAIRNS

Charter-party (Voyage) — Safe port — Vessel prevented from leaving port — Whether port "safe" at time of its nomination — Whether temporary obstacles preventing vessel leaving port rendered it unsafe.

The charter-party, which was in the Baltimore form C, dated May 17, 1973, called for three voyages by bulk carriers to be nominated by the owners. The laydays and cancelling dates in respect of the first voyage were Nov. 15, 1973/Dec. 26, 1973, and on Nov. 30, 1973, the owners nominated the vessel Hermine. She was capable of carrying 29,532 long tons of grain on a fresh water draught of 35 ft. 10½ in. and the charterers called for the loading of a full and complete cargo.

Under the terms of the charter, the vessel was required to proceed to—

. . . one (1)/two (2) safe berths, one (1) safe port U.S. Gulf . . . understood New Orleans, Destrehan, Ama, Myrtle Grove Reserve, count as one (1) port.

On Dec. 27, 1973, the charterers nominated the port of Destrehan.

Destrehan was on the Mississippi River, about 140 miles from the open sea. Leaving Destrehan, Hermine had to go down river and pass through the Southwest Pass which was a scoured and dredged channel. The depth of the channel varied from time to time according to the time of year, the speed of the river and the energy and resources of the dredging authority. A controlling draught was published daily and this represented the recommended maximum deep loading draught, freshwater at all times regardless of tides.

The time normally required for a vessel to sail from Destrehan to the open sea was 10 to 12 hours, but Hermine was delayed from 00 45 hours on Jan. 27, 1974, when she completed loading, until Mar. 5, 1974. She would have been delayed until Mar. 12, 1974, but for the fact that the vessel's draught had been reduced by lightening to 33 ft. 7 in.

The delay was caused (1) between 00 45 hours on Jan. 27 and 05 30 hours on Jan. 31, by congestion, the primary cause of which was severe fog which had been restricting navigation through the pass; (2) between 05 30 hours on Jan. 31 and 18 00 hours